UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND



Chambers of
Matthew J. Maddox
United States Magistrate Judge
MDD_MJMChambers@mdd.uscourts.gov

101 West Lombard Street
Chambers 3B
Baltimore, Maryland 21201
(410) 962-3407

September 30, 2022

TO ALL COUNSEL OF RECORD

Re:   *James L. v. Commissioner, Social Security*
      Civil No. MJM-21-1718

Dear Counsel:

On July 9, 2021, Plaintiff commenced this civil action seeking judicial review of the final decision of the Commissioner of Social Security Administration ("SSA," "Defendant") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. (ECF No. 1). Pending before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 14) and Defendant's Motion for Summary Judgment (ECF No. 18).[1] I have reviewed the pleadings and the record in this case and find that no hearing is necessary. Loc. R. 105.6. The Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed.  42 U.S.C. §§ 405(g), 1383(c)(3); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020). Under this standard, Plaintiff's motion will be DENIED, Defendant's motion will be GRANTED, and the SSA's decision will be AFFIRMED.

I.   **Background**

Plaintiff filed his application for DIB and SSI on May 10, 2019, alleging disability beginning on April 1, 2017. (R. 17). Plaintiff's application was initially denied on October 10, 2019, and the initial determination was affirmed upon reconsideration on May 12, 2020. (*Id.*) Thereafter, Plaintiff requested an administrative hearing, and Administrative Law Judge ("ALJ") Tara J. Posner held a telephone hearing on December 9, 2020. (*Id.*) Plaintiff, who was represented by counsel, testified at the hearing. (*Id.*) An impartial vocational expert also appeared and testified. (*Id.*) Following the hearing, the ALJ issued a decision denying Plaintiff's claims on January 26, 2021. (R. 17–29). On May 20, 2021, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (R. 1). Plaintiff then filed this civil action seeking judicial review under 42 U.S.C. § 405(g).

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF No. 4).

*James L. v. Commissioner, Social Security*
Civil No. MJM-21-1718
September 30, 2022
Page 2

## II.  The SSA's Decision

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining Plaintiff's disability claims, the ALJ followed the five-step sequential evaluation of disability set forth in 20 C.F.R. § 416.920.

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

*Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015). If the first three steps do not yield a conclusive determination of disability, the ALJ then assesses the claimant's residual functional capacity ("RFC"), "which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Id.* at 635 (quoting 20 C.F.R. § 416.945(a)(1)). The ALJ determines the claimant's RFC by considering all of the claimant's medically determinable impairments, regardless of severity. *Id.* The claimant bears the burden of proof through the first four steps of the sequential evaluation. *Id.* If she makes the requisite showing, the burden shifts to the SSA at step five to prove "that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting 20 C.F.R. §§ 416.920, 416.1429).

When mental impairments are alleged, the ALJ must apply the "special technique" to determine the severity of the mental impairments. 20 C.F.R. § 404.1520a. The ALJ is required to rate the limitations in four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself (known as "paragraph B criteria" for mental disorders). *Id.* § 404.1520a(c)(3). The ALJ uses a five-point scale to rate a claimant's limitations in these functional areas: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). The rating is based on the extent to which the claimant's impairment "interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 404.1520a(c)(2). If rating of a limitation is "none" or "mild," then the ALJ generally concludes that the mental impairment is not severe. *Id.* § 404.1520a(d)(1).

In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of April 1, 2017. (R. 19). At step two, the ALJ found that Plaintiff had the following severe impairments: epilepsy, other disorder of the bone and cartilage, status-post fractures of the bilateral shoulders, depressive disorder, and anxiety disorder. (R. 20). At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Then, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except:

> [Plaintiff] can never climb ramps, stairs, ladders, ropes, or scaffolds, never crawl, and can occasionally balance, stoop, kneel, and crouch. He can never work at unprotected heights or around moving mechanical parts. He cannot perform work that requires exposure to vibration. He is able to perform simple, routine tasks and have occasional interaction with coworkers, the public, and supervisors.

(R. 22). At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (R. 27). Lastly, at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 27). Thus, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act. (R. 29).

### III.     Standard of Review

The Court reviews an ALJ's decision to ensure that the ALJ's findings "are supported by substantial evidence and were reached through application of correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id*. (internal quotation marks and citations omitted). In accordance with this standard, the Court does not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal brackets and citations omitted). Instead, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Id*. (citation omitted).

### IV.     Discussion

In this case, Plaintiff argues that the ALJ erred in (1) her assessment of medical impairment listings, (2) her assessment of his RFC, (3) her evaluation of the medical opinion evidence, and (4) her evaluation of the vocational expert opinion evidence. Since the issues raised are closely related to the ALJ's evaluation of the objective medical records and subjective statements and reports, the Court begins with analyzing the pertinent portion of the ALJ's opinion.

#### A. The ALJ's Opinion

It is noted that Plaintiff experienced his first epileptic seizure on or about November 7, 2016, at age 21. (R. 22, 398, 474). He was taken to the emergency room where providers found dislocation of the bilateral shoulders and fractures in both arms, requiring fixation surgery. (*Id*.) He was referred to Maya Carter, M.D., a neurologist of Annapolis Neurology Associates. (R. 398). He told Dr. Carter that on the day of the incident, he "was talking on the phone and playing video games" and "remembers standing up." (R. 449). His friend apparently heard him make a weird noise and heard

a crash. (*Id.*) Plaintiff remembered that he went downstairs with his nose bleeding and his shoulders were hunched. (*Id.*) Plaintiff had an MRI of the brain, which was normal, but an EEG showed generalized spike and wave discharges. (R. 22, 398, 448). Dr. Carter prescribed Lamotrigine. (R. 449).

Plaintiff subsequently suffered two additional generalized tonic-clonic seizures on March 21, 2017. (R. 22, 398, 445). He was taken to an emergency room and had a computed tomography (CT) scan of the head, which was normal, as well as a normal electroencephalogram (EEG). (R. 22, 445).

Plaintiff reported to Dr. Carter that his last significant seizure was in April 2017. (R. 22, 441). He then denied seizures at every neurologic visit afterwards. (R. 22, 428–66, 479–97, 533–40). Dr. Carter consistently reported that Plaintiff's seizure symptoms are well controlled with prescribed Trokendi. (*See e.g.*, R. 430, 434, 436, 438, 440, 486, 535). Plaintiff generally denied side-effects associated with this medication but did report decreased sweating and initial mild word-finding difficulties (*See e.g.*, R. 433, 434, 435, 436, 437, 438, 441, 442, 485). He also reported occasional instances of a foggy/hazy aura and myoclonic jerks in the extremities without confusion, with the last event having occurred in 2018. (R. 22, 433, 474).

The ALJ also noted that providers were concerned about Plaintiff's alcohol consumption and its effects on his condition. (R. 23, 398, 420, 474). For example, Plaintiff had been drinking daily, about "3-4 beers a day," before he had his first seizure, and a provider commented that the first seizure apparently was an alcohol withdrawal seizure.[2] (R. 398, 420). Plaintiff's elevated liver function test (LFT) results may be alcohol related. (R. 509, 539). He was advised to stop drinking. He reduced daily drinking reporting to "1 glass of red wine every couple of days" in 2018 and one to two beers or glasses of wine per day in 2019 and 2020. (R. 435, 474, 494, 534).[3]

With respect to the injuries sustained in his shoulders and arms when Plaintiff had his first seizure, the record shows that after the surgery of his shoulders and arms, Plaintiff experienced pain with reaching and initially diminished motor strength bilaterally. (R. 23, 411). Plaintiff had physical therapy in early 2017. (R. 412). In April 2017, providers reported full muscle strength, good sensation, good coordination, and normal gait. (R. 23, 398). In September 2017, a provider from Chesapeake Orthopaedic & Sports Medicine Center noted that Plaintiff demonstrated full range of motion of both shoulders and full strength in both upper extremities, but with continued diminishment of bilateral biceps reflexes. (R. 23, 523).[4] Thereafter, another provider reported normal symmetry and strength in all four limbs, normal bulk and tone of muscles, normal

---

[2] One provider warned Plaintiff "not to drink alcohol again, as it is a trigger for his seizures." (R. 421). Another provider also noted very elevated liver enzymes and advised Plaintiff to stop drinking in early 2020. (R. 506). The record shows that Plaintiff has attempted to stop drinking. (R. 450).

[3] Plaintiff stated that he drank alcohol while taking seizure medication. (R. 330).

[4] Plaintiff later reported in September 2017 that he gradually discontinued the therapy on his own and "he's been using the arms freely without restriction." (R. 523).

coordination, and normal gait in 2018. (R. 23, 421).

In April 2019, Plaintiff reported a fall when getting out of a truck, resulting in sprained ankle. (R. 23, 429). He reported to Dr. Carter that he felt his legs were weak and he had difficulty getting up from the floor. (R. 429). Diagnostic imaging of the spine revealed only mild degenerative changes, and an MRI of the brain performed in May 2019 was normal. (R. 23, 475, 489). Nerve conduction testing performed in May 2019 did not show any evidence of large fiber peripheral neuropathy or lumbar radiculopathy, but it did show reduced activation with the right medical gastrocnemius muscle possibly related to pain in the right ankle/foot from the claimant's fall and/or prior injuries. (R. 23, 488). A dual-energy X-ray absorptiometry (DEXA) scan of the lumbar spine and bilateral hips showed bone mineral density in the osteoporosis range. (R. 23, 489, 570). Dr. Carter generally noted that Plaintiff had full motor strength in upper and lower extremities, and a narrow-based gait, within normal limits until early 2020. (R. 23, 430, 490, 496).

After the fall from the truck, Plaintiff continued to fall multiple times, with an unclear etiology. (R. 23, 474). Plaintiff began physical therapy for osteoporosis in November 2019.[5] (R. 23, 474, 578). By January 2020, providers reported that Plaintiff was able to perform 15 squats with wall-balls in 3 minutes, 20 shoulder extensions in 3 minutes, 20 back rows in 3 minutes, and hold a bridge for 15 seconds at a time. (R. 24, 601). He was reported being "able to walk for about 45-60 minutes." (R. 24, 604).

In February 2020, Plaintiff visited Dr. Carter. He reported no seizures, no jerking, no mood issues, and no issues with anhidrosis, and he was tolerating seizure medications without difficulty. (R. 533). Plaintiff also reported that he had "seen a hepatologist for elevated LFTs and reported that his values have decreased." (*Id*.) He commented that physical therapy was helpful, but he complained about insomnia. (*Id*.) Dr. Carter reported narrow-based gait, full motor strength in all extremities, and full reflexes (R. 24, 535). In March 2020, Plaintiff reported right leg pain with stair climbing and floor-to-stand transfers and episodes of dizziness related to epilepsy. (R. 24, 639). By April 2020, physical therapy providers reported improvement in motor strength in all extremities, and Plaintiff was discharged from physical therapy with the ability to carry groceries without difficulty, drive up to 20 minutes without issue, put dishes away without difficulty, sleep through the night, and go from the floor to standing without difficulty. (R. 24, 646). The provider opined that Plaintiff's "prognosis at time of discharge is good." (R. 646).

Plaintiff's last available treatment record with Dr. Carter is dated July 1, 2020. (R. 537). Plaintiff reported no seizures, no side-effects from Trokendi, no issues with overheating, and well-controlled mood. (R. 24, 537). Plaintiff did report insomnia. (R. 537). Dr. Carter noted that Plaintiff's seizures were "currently well controlled with Trokendi." (R. 539). He had "elevated LFTs . . . of unclear etiology," which "did not appear to be secondary to Trokendi," but "may be alcohol related." (R. 539). Dr. Carter also noted that Plaintiff had been diagnosed with osteoporosis. (*Id*.) Plaintiff was able to stand with arms crossed at that time. (*Id*.)

---

[5] The provider noted during initial evaluation that the "[o]verall rehabilitation potential is good." (R. 579).

*James L. v. Commissioner, Social Security*
Civil No. MJM-21-1718
September 30, 2022
Page 6

On November 23, 2020, Plaintiff obtained a functional capacity evaluation ("FCE"). (R. 24, 545–50). This evaluation was not directed by the SSA, and was conducted by Chris Hoffman, whose credentials are not clear.[6] (R. 24). Nonetheless, the ALJ evaluated Mr. Hoffman findings.[7] Mr. Hoffman reported that Plaintiff attended the evaluation in a rented wheelchair and used a gait belt for safety. (R. 24, 561–64). Plaintiff stated that he ascends and descends stairs at home by sliding on his buttocks/hips. (*Id.*) According to Mr. Hoffman, Plaintiff "was only able to stand for one minute, sit for 60 minutes, and walk for 0 miles." (*Id.*) "He was also unable to perform any lifting, pulling, balancing, crouching, reaching, climbing, stooping, kneeling, crawling, or grasping, holding, and manipulating of objects." (R. 24). Mr. Hoffman opined that Plaintiff "would not be able to return to work in any capacity." (*Id.*)

The ALJ found that Mr. Hoffman's opinion is non-persuasive due to lack of support from the record. The ALJ explained that "there is nothing in the record to support such significant limitations in lifting[,]" and as of early 2020, Plaintiff "was able to carry items such as groceries and other items in general[] and up stairs, albeit with some difficulty." (R. 24, 578–657). The ALJ also pointed out that Plaintiff's improvement with physical therapy, and benign and unremarkable imaging and testing just a few months before the FCE, tended to undermine the restrictive presentation described by Mr. Hoffman, in the absence of treatment records to support that description. (R. 24). Moreover, there was "nothing in the record to support any significant preclusion from sitting as there was only minimal degeneration in the spine and none in the hips, as well as functional motor strength in the extremities and no circulation issues." (*Id.*)

With respect to Plaintiff's mental health issues, the ALJ noted that the record includes "very little . . . objective evidence by which to assess the severity of any mental disorder" and "very little" information concerning "treatment for any mental health disorder." (R. 25). The ALJ found that Plaintiff's "[m]ental status examinations had been largely unremarkable with articulate and fluent speech, with intact recall and memory, good concentration, and ability to count backwards from 100 by 7." (*Id.*) The ALJ found that neurology records from Dr. Carter in 2020 and assessments from other providers consistently reflected a well-controlled mood. (R. 25, 523, 535, 537). In 2018 and 2019, neurology providers advised that Plaintiff abstain from alcohol consumption and indicated that his seizures and complaints of tiredness may be related in part to depression and associated to Plaintiff's alcohol use. (R. 25, 421, 477).

The record includes two letters dated April 6, 2019, and September 4, 2019, from Karin Anstendig Mosk, Psy.D., a psychotherapist, in which she described three sessions she had with Plaintiff in general terms. The first letter provides:

> I saw [Plaintiff] for psychotherapy sessions at the end of last year and once this current year. He presented as having mood and anxiety issues that are

---

[6] Mr. Hoffman may be associated with Kure Smart Pain Management. (R. 545–550).

[7] Plaintiff alleged that "the FCE is purely objective medical findings and not at all opinion-based." (ECF No. 14-1 at 29).

> significant and interfere with his ability to function well, outside of the family home. [Plaintiff] also struggles with significant health concerns, for which he required supportive therapy. [Plaintiff] and I discussed, at great length, the idea of holding employment and the obstacles his illness and subsequent anxiety pose. It is my belief that his physical and emotional ailments are inhibiting his current ability to work.

(R. 401). The second letter provides:

> [Plaintiff] was a patient of mine, seen in my office for 3 visits. He was first seen on 11/9/2017. His diagnoses were F33.1, Major Depressive Disorder, recurrent and F41.1, Generalized Anxiety Disorder. He presented as having mood and anxiety issues that were significant and interfered with his ability to function well, outside of the family home. [Plaintiff] also struggled with significant health concerns, for which he required supportive therapy. Over the 3 sessions, [Plaintiff] and I discussed, at great length, the idea of holding employment and the obstacles his illness and subsequent anxiety pose. It was my belief at the time that his physical and emotional ailments were inhibiting his ability to work. Although he truly expressed a desire to work, [Plaintiff] was struggling with basic care needs that precluded his ability to care for himself and follow through on simple goals required to find and maintain appropriate employment. For example, [Plaintiff] struggled with cognitive arousal and could not hold his attention to any specific task. He also had significant difficulty communicating his thoughts. At the time, [Plaintiff] also demonstrated disordered thinking, which ultimately was linked to a change in medication.
>
> [Plaintiff] was directed to other providers who were more suited to care for his epilepsy and medication side-effects. He also required more frequent care than my practice was able to support. His last date of contact was 01/10/2018.

(R. 470). Noting the lack of treatment from Dr. Mosk and the lack of follow-up with her, the ALJ concluded that Dr. Mosk's assessment of Plaintiff was non-persuasive. The ALJ explained that Dr. Mosk's opinion was "not entirely consistent with the overall record supporting unremarkable mental status examinations and supported by only three treatment visits." (R. 25).

The ALJ also examined a mental residual function capacity questionnaire and a physical residual function capacity questionnaire, both dated November 25, 2020, from Dr. Carter. (R. 551–60). According to Dr. Carter, Plaintiff "would be unable to maintain regular attendance, perform at a consistent pace, accept instructions, get along with coworkers and peers, deal with normal work stress, and generally maintain socially appropriate behavior." (R. 26, R. 551–55). "She also indicated that [Plaintiff] would be absent from work for more than four days per month." (*Id.*) This assessment was deemed to be of "minimal persuasion" to the ALJ because such significant restrictions were not supported by Plaintiff's medical records. (*Id.*) The ALJ explained that while

Plaintiff's seizure disorder and anxiety disorder account for some mental health limitations, there is little in the record that documents evaluations and treatments of these mental health issues. (*Id.*) The ALJ also pointed out the inconsistencies between Dr. Carter's latest assessment of Plaintiff's mental health issues and Plaintiff's medical records where she generally noted "unremarkable mental and neurologic examinations." (*Id.*)

Dr. Carter also opined that, physically, Plaintiff "would be limited [to] lifting less than 10 pounds rarely, and to less than 2 hours of sitting, standing, and walking in an 8-hour working day, with no stooping, squatting, and climbing, and no use of the upper extremities." (R. 26, 556–60). It appears that Dr. Carter's assessment was based on the FCE conducted by Mr. Hoffman discussed above. (R. 24, 556, 559). For reasons similar to those articulated when discussing the FCE, the ALJ found Dr. Carter's assessment with respect to the significant restrictions on Plaintiff's upper extremities to be non-persuasive. Moreover, the ALJ noted the lack of significant treatment or signs in the upper extremities in the record since Plaintiff's surgery. (R. 26). The ALJ found the remainder of Dr. Carter's assessment of Plaintiff's physical condition to be generally persuasive. (*Id.*)

Additionally, the ALJ evaluated medical opinions from the state agency medical consultants and found them partially persuasive. The ALJ noted that "the combination of signs in the shoulders and lower extremities, warranting physical therapy and the use of an assistive device, as well as the possibility of breakthrough seizures with possible postictal fatigue, support a reduction to the sedentary range of exertion." (R. 25–26). The ALJ found that the state agency mental health consultants' assessments were minimally persuasive. He noted that, although there is little objective evidence to support very significant limitations based on mood symptoms, "the record does establish anxiety, as well as possible post-ictal confusion and fatigue, which would be likely somewhat to the detriment of [Plaintiff's] ability to understand information during those times, interact with others, and manage himself." (R. 26).

Lastly, the ALJ considered a function report from Plaintiff's mother. Plaintiff's mother stated that Plaintiff "has trouble sleeping due to fear of having a seizure and dying in his sleep and does not do yard work due to difficulty sweating leading to overheating." (R. 26, 310–20). She described Plaintiff's "difficulty driving, lifting, climbing stairs, kneeling, and bending." (R. 26). She acknowledged that Plaintiff "is able to do dishes, take out trash, clean his room, use a computer, count change, draw, play video games, watch television, and spend time with family and friends on video games." (*Id.*) Plaintiff's mother also described "symptoms of generalized anxiety disorder" that Plaintiff has suffered "since middle school heightened by anxiety regarding [his] seizure disorder." (*Id.*) With respect to Plaintiff's mental health problems, Plaintiff's mother reported "issues understanding, following instructions, concentrating, completing tasks, and getting along with others." (R. 27, 310–20). Because the ALJ found the report of Plaintiff's mother to be consistent with the Plaintiff's own statements, as well as observations of physical therapy and neurologic providers, it has been taken into account by the ALJ in formulating Plaintiff's RFC. (R. 27).

Turning to the arguments presented, Plaintiff first challenges the ALJ's assessment of medical impairment listings. Plaintiff argues that the ALJ failed to discuss whether his impairments

meet Listing 1.19 for Major Dysfunction of a Joint and "any of the Neurological Listings 11.00, et seq., (11.02, 11.07, 11.14, ec.)." (ECF No. 14-1 at 12). Plaintiff also argues that the ALJ "failed to properly evaluate or draw a logical bridge from the evidence to the findings of the Paragraph B criteria of Listing 12.04 for [Plaintiff's] severe mental health impairments." (*Id*.)

### B. ALJ's Assessment of Medical Impairment Listings

A claimant is entitled to a conclusive presumption that he is disabled within the meaning of the Social Security Act where he can show that his condition "meets or equals the listed impairments" in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Bowen v. City of New York*, 476 U.S. 467, 471 (1986). "[A]n ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F.Supp.2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). But the duty to identify relevant impairments according to listing criteria "is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." *Ketcher v. Apfel*, 68 F.Supp.2d 629, 645 (D. Md. 1999). "Neither the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment." *Id*. The burden of proof is on the claimant to show that he meets all of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Johnson v. Berryhill,* 2017 WL 6994533, *4 (D. Md. 2017) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

Here, the ALJ did not discuss Listing 1.19, which concerns pathologic fractures due to any cause which must be documented by "[p]athologic fractures occurring on three separate occasions within a 12–month period" and "[i]mpairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months…." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.19 (effective May 21, 2020). Pathologic fractures result from disorders that weaken the bones, making them vulnerable to breakage. *Id*. The record shows that the dislocation of the bilateral shoulders and fractures in both arms were the result of a seizure—not pathologic fractures caused by disorders that weaken the bones. Therefore, Listing 1.19 is not applicable here, and the ALJ was not required "to discuss all or any of the listed impairments. . . ." *Ketcher*, 68 F. Supp. 2d at 645.[8]

Moreover, in September 2017, five months after his alleged onset date, Plaintiff had a routine check up with a provider at Chesapeake Orthopaedic & Sports Medicine Center regarding "bilateral shoulder fractures associated with anterior dislocation." (R. 523). He told the provider that he had "been using [his] arms freely without restriction" and demonstrated "full range of motion of both shoulders [and] full strength in both upper extremities." (*Id*.) The provider also noted a "[w]ell-healed proximal humerus fracture with a lateral plate and screws in place." (R. 524).

---

[8] Plaintiff mentions "Listing 1.19 for Major Dysfunction of a Joint." (ECF No. 14-1 at 12). Major dysfunction of a joint does not appear to be specifically associated with Listing 1.19.

Furthermore, when questioned about his shoulder issues at the hearing, Plaintiff testified that his "shoulders are healed," are "mostly back to normal," and his "implants are fully motional." (R. 46, 47, 52). He also commented that he does not have any problems with his hands and fingers. (R. 47). Plaintiff's mother reported that "lifting weights in the basement," drawing, and doing artwork are part of Plaintiff's daily routine. (R. 311, 315). The ALJ also noted that Plaintiff spent time online gaming, and he was able to maintain his personal care and grooming, as well as drive. (R. 21, 333, 335). As the ALJ observed, treatment records did not support any significant symptoms in Plaintiff's arms post-surgery (R. 23). Therefore, Plaintiff fails to establish that the ALJ erred by omitting discussion of Listing 1.19.

With respect to the neurological listings, the relevant listing is Listing 11.02 since Plaintiff was diagnosed with epilepsy "documented by a detailed description of a typical seizure and characterized" by either generalized tonic-clonic seizures or dyscognitive seizures. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 11.02 (effective March 14, 2018). A tonic-clonic seizure is "characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." *Id*. § 11.00H1a. A dyscognitive seizure is "characterized by alteration of consciousness without convulsions or loss of muscle control." *Id*. § 11.00H1b. For a claimant who had either type of seizure to meet all of the specified medical criteria for Listing 11.02, the seizure has to occur "at least once a month for at least 3 consecutive months … despite adherence to prescribed treatment," or "at least once every 2 months for at least 4 consecutive months … despite adherence to prescribed treatment" with a certain marked limitation. *Id*.

The record shows that Plaintiff had three generalized tonic-clonic seizures: one on November 7, 2016, and two in one day in March 2017.[9] (R. 543). The ALJ discussed the lack of evidence concerning the frequency of Plaintiff's seizures, which is essential to the listing: "there is no support for one or more seizures per month for at least three consecutive months, or at least once every two months for at least four consecutive months despite adherence to prescribed treatment." (R. 20). Therefore, contrary to Plaintiff's assertion, the ALJ addressed Listing 11.02 and correctly found that Plaintiff did not meet this listing.

The ALJ also considered Listings 12.04 and 12.06 for Plaintiff's mental impairments. (R. 20–21). To meet Listings 12.04 (depressive, bipolar, and related disorders) or 12.06 (anxiety and obsessive-compulsive disorders), a claimant must meet the requirements in paragraph A and either paragraph B or paragraph C. Paragraph A of each listing requires medical documentation of relevant disorders characterized by specified symptoms, or a bipolar disorder characterized by three or more specified symptoms. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(A), 12.06(A) (effective March 14, 2018). Listings 12.04 and 12.06 include the same criteria in Paragraphs B and C.

---

[9] Multiple seizures occurring in a 24-hour period should be counted as one seizure. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00(H)4a.

Paragraph B requires the analysis of four areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. *Id.* §§ 12.04(B), 12.06(B). The ALJ is required to evaluate the effects of the claimant's mental disorder on each of the four areas of mental functioning based on a five-point rating scale consisting of no limitation (claimant is able to function in this area independently, appropriately, effectively, and on a sustained basis); mild (claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited); moderate (claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair); marked (claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited); and extreme (claimant is not able to function in this area independently, appropriately, effectively, and on a sustained basis). *Id.* §§ 12.00(F)(2), To satisfy the Paragraph B criteria, a claimant's mental disorder must result in extreme limitation of one area, or marked limitation of two areas, of mental functioning. *Id.* §§ 12.04(B), 12.06(B).

Paragraph C requires the mental disorder be "serious and persistent," such that the claimant has a medically documented history of the existence of the disorder over a period of at least two years and evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment, meaning the claimant has minimal capacity to adapt to changes in the environment or demands that are not already part of her daily life. *Id.* §§ 12.04(C), 12.06(C).

Plaintiff challenges the ALJ's analysis of Paragraph B criteria of Listing 12.04. (ECF No. 14-1 at 12). With respect to mental impairments, Plaintiff's case suffers from a lack of evaluation and treatment records from mental health providers. As discussed above, the only records from mental health providers are two brief letters, dated April 6, 2018, and September 4, 2019, from Dr. Mosk, a psychotherapist, who apparently saw Plaintiff three times in late 2017 and early 2018. (R.401, 470). In these letters, Dr. Mosk briefly described these sessions in general terms without providing any medical records to support her "belief at the time that [Plaintiff's] physical and emotional ailments [were] inhibiting his ability to work." (*Id.*) The lack of treatment, lack of follow-up, and lack of mental health provider notes, combined with the overall record supporting unremarkable mental status examinations for Plaintiff's other providers, weighs against Plaintiff's argument that he suffers from severe mental impairments.

The ALJ found that Plaintiff has a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing himself.[10] (R. 20–21). To reach that conclusion, the ALJ cited specific information in the medical records from Plaintiff's providers as well as Plaintiff's statements from his function report. The lack of evaluation and treatment records from mental health providers, as discussed above, also

---

[10] The ALJ also considered whether the Paragraph C criteria are satisfied and concluded that the evidence fails to establish the presence of the Paragraph C criteria. (R. 21).

supports the ALJ's determination. Therefore, the ALJ's assessment of medical impairment listings is supported by substantial evidence.

### C. ALJ's RFC Analysis

Second, Plaintiff challenges the ALJ's assessment of his RFC. "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The RFC assessment represents the most a claimant can do despite any physical and mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). Thus, when an ALJ assesses a claimant's RFC, he is expressing it in terms of the claimant's maximum remaining ability to perform sustained work. *See* SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history; medical signs and laboratory findings; treatment records; reports of daily activities; lay evidence; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *See* SSR 96-8p, 1996 WL 374184, at *5. But age and body habitus are not factors in assessing RFC. *Id*. at *1. "In performing this assessment, an ALJ 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations).'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (citing *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)). "In other words, the ALJ must both identify evidence that supports [their] conclusion and 'build an accurate and logical bridge from [that] evidence to [their] conclusion.'" *Id*. (citing *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

Here, the ALJ's RFC assessment was based on her analysis of the evidence in the record, which she summarized and analyzed in narrative form in her decision. (R. 22–27). As discussed above, the ALJ summarized and examined Plaintiff's complaints (such as his seizure-related symptoms, osteoporosis-related issues, and ability to stand and walk) and medical records concerning his physical and mental impairments and related issues. (R. 22–24). The ALJ also discussed the FCE conducted by Mr. Hoffman in November 2020, even though "it [was] unclear whether Mr. Hoffman [was] an acceptable medical source." (R. 24). Due to a lack of support in the record, the ALJ found non-persuasive Mr. Hoffman's opinion that Plaintiff "would not be able to return to work in any capacity." (*Id*.) The ALJ pointed to specific medical records from providers demonstrating Plaintiff's improvement with physical therapy as well as benign and unremarkable imaging and testing results just a few months before the FCE. (*Id*.)

The ALJ then found that "residual symptoms in the bilateral upper extremities would limit climbing of ladders, ropes, and scaffolds and crawling, which would require the use of the upper extremities." (*Id*.) And the "combination of these symptoms, as well as the possibility of breakthrough seizures warrants the avoidance of hazards." (*Id*.) Moreover, "findings of osteoporosis along with residual upper extremity symptoms and side-effects of fatigue and occasional instances of foggy aura support a reduction to the sedentary level of exertion." (*Id*.) The ALJ did not find that the record supports any limitations in sitting, and in view of Plaintiff's age

*James L. v. Commissioner, Social Security*
Civil No. MJM-21-1718
September 30, 2022
Page 13

and functional activities of daily living, a more restrictive physical RFC is not warranted. (*Id.*)

As to Plaintiff's mental health, the ALJ noted the lack of records from mental health providers and largely unremarkable observations from other providers as well as neurology records that "consistently reflect[] a well-controlled mood." (R. 25). The ALJ also commented on the concerns about Plaintiff's alcohol consumption from his neurology providers. (*Id.*) The ALJ then examined Dr. Mosk's letters and found that her assessments were non-persuasive for lack of supporting evidence. (*Id.*) The ALJ also reasoned that Dr. Mosk's conclusion was not consistent with the record as a whole. (*Id.*)

Next, the ALJ considered the medical opinions from state agency medical consultants and found them partially persuasive, supporting a reduction to the sedentary range of exertion. (R. 25–26). The ALJ also found the state agency mental health consultants' assessments minimally persuasive. (R. 26). She found that while little objective evidence exists to support very significant limitations based on mood symptoms, "the record does establish anxiety, as well as possible post-ictal confusion and fatigue, which would be likely somewhat to the detriment of [Plaintiff's] ability to understand information during those times, interact with others, and manage himself." (*Id.*)

Additionally, the ALJ examined residual function capacity questionnaires, dated November 25, 2020, from Dr. Carter. The ALJ found Dr. Carter's assessment of Plaintiff's mental capacity minimally persuasive. (R. 26). While acknowledging that Plaintiff's seizure disorder and anxiety disorder account for some mental health limitations, the ALJ found nothing in the record to support significant restrictions suggested by Dr. Carter (such as inability to perform at a consistent pace, accept instructions, and maintain socially appropriate behavior, as well as absence from work for more than four days per month). (*Id.*) Moreover, such restrictions are inconsistent with Plaintiff's treatment records by Dr. Carter from December 2016 to July 2020. (*Id.*) ALJ found Dr. Carter's assessment with respect to the significant restrictions on Plaintiff's upper extremities to be non-persuasive due to the lack of records showing significant treatment or signs in the upper extremities since Plaintiff's surgeries. (*Id.*) The ALJ found the remainder of Dr. Carter's assessment of Plaintiff's physical condition to be generally persuasive. (*Id.*)

Moreover, the ALJ addressed Plaintiff's potential flare-ups. In March 2017, Dr. Carter estimated that Plaintiff may have one flare-up of symptoms every week, with incapacitation lasting three days per episode over the next six months. (R. 409). However, another provider from University of Maryland Medical Center, Neurology Care Center noted in December 2019 that Plaintiff reported symptoms of foggy/hazy aura once or twice per month, sudden jerks once per day lasting less than five minutes, and two hours of postictal confusion, and the last event was one year prior. (R. 474). The ALJ found that Plaintiff's neurology records do not support the one flare-up per week estimate because Plaintiff had reported no recent seizures. (R. 26).

Lastly, the ALJ evaluated a third-party function report from Plaintiff's mother and found her report to be consistent with the Plaintiff's own statements, as well as observations of physical therapy and neurology providers. The ALJ took into account Plaintiff's mother's statements in the RFC assessment. (R. 27).

Plaintiff argues, *inter alia*, that the ALJ relied solely on objective medical evidence, and she failed to accurately note Plaintiff's statements as well as third party reports and statements. To evaluate a claimant's self-reported symptoms, the ALJ must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (S.S.A., Mar. 16, 2016). *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). "First, the ALJ must determine whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). "Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Id.* (quoting 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4).

In considering the intensity, persistence, and limiting effects of the symptoms, the ALJ examines the entire case record, including the objective medical evidence; the claimant's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the case record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4–7. The ALJ can also consider factors such as daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; and treatment, other than medication, received for relief of pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *7.

Statements about the intensity, persistence, and limiting effects of symptoms will be evaluated in relation to the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8. The ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements and the rest of the evidence. *Id*. But the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *5). The symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the alleged functional limitations and restrictions due to the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *8.

Here, the ALJ summarized Plaintiff's self-reported symptoms and testimony, and after careful consideration of the evidence in the record, found that Plaintiff's medically determinable impairments could reasonably be expected to cause the reported symptoms. (R. 22) But Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were found not to be entirely consistent with the medical evidence and other evidence in the record. (*Id.*) As discussed above, the ALJ examined the reported symptoms, to include seizure-related issues, symptoms in the bilateral upper extremities post-surgery, issues associated with the fall in 2019, gait, strength in the extremities, and the alleged inability to stand and walk. (R. 23). To analyze

*James L. v. Commissioner, Social Security*
Civil No. MJM-21-1718
September 30, 2022
Page 15

these alleged symptoms, the ALJ assessed information from medical sources as well as relevant reports and statements from non-medical sources. The ALJ took into consideration factors such as daily activities; factors that precipitate and aggravate the symptoms; effects of mediation and treatments; and the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms. Consistency with the objective medical evidence and other evidence was also a factor the ALJ considered when assessing the Plaintiff's statements about his symptoms.

In sum, the ALJ examined and analyzed both subjective evidence and objective evidence in the record. It was only after evaluating the entire record and explaining his findings that the ALJ formulated Plaintiff's RFC. The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence in this case.

### D. ALJ's Assessment of Medical Opinions

Third, Plaintiff challenges the ALJ's evaluation of the medical evidence and medical opinions. Plaintiff argues that the ALJ failed to give proper weight to the opinions of Dr. Carter, one of Plaintiff's long-time treating providers. (ECF No. 14-1 at 28). Plaintiff also avers that the ALJ failed to give proper weight to the FCE.

For claims filed on or after March 27, 2017 (such as Plaintiff's claim in this case), an ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a claimant's medical source." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers medical opinions and prior administrative medical findings using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with other evidence in the claim and understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion. 20 C.F.R. § 404.1520c(a). The ALJ is not required to explain the consideration of the other three factors. 20 C.F.R. § 404.1520c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Here, the ALJ's assessments of Dr. Carter's opinion were based on his analysis of Plaintiff's medical records, with a focus on whether they supported and were consistent with Dr. Carter's opinion. As discussed above in detail, the record includes medical notes from Dr. Carter from December 2016 to July 2020 as well as medical records from other providers in 2017, 2018 and 2019. Dr. Carter consistently reported that Plaintiff's seizure symptoms were well controlled with prescribed Trokendi. (*See e.g.*, R. 430, 434, 436, 438, 440, 486, 535).

When Plaintiff had a fall as he was getting out of a truck, he reported to Dr. Carter that he felt his legs were weak and he had difficulty getting up from the floor. (R. 429). A DEXA scan of lumbar spine and bilateral hips showed bone mineral density in the osteoporosis range. (R. 23, 489, 570). Since then, Dr. Carter generally noted that Plaintiff had full motor strength in upper and lower extremities, and a narrow-based gait, within normal limits until early 2020. (R. 430, 490, 496).

During his visit to Dr. Carter in February 2020, Plaintiff reported no seizures, no jerking, no mood issues, no issues with anhidrosis, and no issues with seizure medications. (R. 533). He reported that physical therapy he received for osteoporosis after a series of falls was helpful, although he complained about insomnia. (*Id.*) Dr. Carter reported narrow-based gait, full motor strength in all extremities, and full reflexes (R. 24, 535). When discharging Plaintiff in April 2020, his physical therapy provider opined that his "prognosis at time of discharge is good." (R. 646). Plaintiff's last available treatment record with Dr. Carter is dated July 1, 2020. (R. 537). Plaintiff reported no seizures, no side-effects from Trokendi, no issues with overheating, and well-controlled mood, although Plaintiff did report insomnia. (R. 24, 537). Dr. Carter noted that Plaintiff's seizures were "currently well controlled with Trokendi." (R. 539).

However, the FCE, dated November 23, 2020, noted that Plaintiff attended the evaluation in a rented wheelchair and used a gait belt for safety. Plaintiff also reported that he ascended and descended stairs at home by sliding on his buttocks/hips. (R. 561–64). Mr. Hoffman reported significant limitations in Plaintiff's ability to stand, sit, walk, and various other physical activities. (*Id.*). Mr. Hoffman concluded that Plaintiff "would not be able to return to work in any capacity." (*Id.*) The ALJ's assessment of the FCE focused on whether it was supported by or consistent with Plaintiff's medical records. The ALJ found Mr. Hoffman's opinion non-persuasive due to lack of support from the record. (R. 24) The ALJ pointed out inconsistencies between the FCE and the medical records from physical therapy providers and benign and unremarkable imaging and testing just a few months before the FCE. (R. 578–657).

The ALJ evaluated Dr. Carter's residual function capacity questionnaires dated November 25, 2022, in a similar fashion focusing on the factors of supportability and consistency as provided in the regulation. Dr. Carter's physical residual function capacity questionnaire apparently largely relied on the FCE. Dr. Carter's assessment with respect to the significant restrictions as to Plaintiff's upper extremities was found to be non-persuasive due to lack of support in the record. (R. 26). But the ALJ found the remainder of the assessment to be generally persuasive. As to Plaintiff's mental impairments, while recognizing that Plaintiff's seizure disorder and anxiety disorder account for some mental health limitations, the ALJ found Dr. Carter's assessment of Plaintiff's mental capacity minimally persuasive. (R. 26). The ALJ explained that the record does not support significant restrictions as suggested by Dr. Carter. (*Id.*) Moreover, such restrictions are inconsistent with treatment records from Dr. Carter. (*Id.*)

Because, in this case, the ALJ's assessments of the medical opinions are supported by substantial evidence in the record, Plaintiff cannot establish that the ALJ erroneously evaluated the medical opinion evidence.

### E. ALJ's Assessment of Vocational Expert Opinion Evidence

Lastly, Plaintiff challenges the ALJ's evaluation of vocational expert opinion evidence. Continuing with his assertion that the ALJ erred in determining his RFC, Plaintiff argues that the ALJ erred in posing a hypothetical question with limitations consistent with the allegedly flawed RFC. (ECF No. 14-1 at 32–36). Plaintiff also argues that two of the three jobs identified by the vocational expert concerning this hypothetical do not comport with the limitations in the RFC assessment. (*Id.*) Plaintiff further argues that the ALJ failed to consider and accept the vocational expert's testimony concerning another hypothetical including limitations of absence three to four days per month or off task 20% or more of the time. (*Id.*) Plaintiff's arguments are unavailing.

Once it is established that a claimant cannot perform past relevant work, the burden shifts to the SSA to establish that a significant number of other jobs are available in the national economy that the claimant can perform. *See* 20 C.F.R. § 404.1520(f). "The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (quoting *Walker v. Bowen*, 889 F.2d 47, 50–51 (4th Cir.1989)). Thus, in order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. *Id*. However, the ALJ is afforded "great latitude in posing hypothetical questions," *Id*. (citing *Koonce v. Apfel*, No. 98–1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)), and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. *Id*. (citing *Copeland v. Bowen*, 861 F.2d 536, 540–41 (9th Cir.1988)). "Therefore, based on his or her evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Id*. (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir.1986)).

Here, the ALJ asked the vocational expert two hypothetical questions during the hearing. (R. 57–59). The first one hypothetical closely mirrored her determination of Plaintiff's RFC. (*Id.*) Because the ALJ's RFC analysis is supported by substantial evidence, the first hypothetical was appropriate. *See France*, 87 F. Supp. 2d at 490. In response, the vocational expert testified that the hypothetical individual could perform three jobs: assembler (DOT: 700.687-062, which is classified as sedentary, unskilled work with an SVP of 2, 80,000 jobs available nationally); bench work (DOT: 715.687-086, which is classified as sedentary, unskilled work with an SVP of 2, 39,000 jobs available nationally); and information clerk (DOT: 237.367-046, which is classified as sedentary, unskilled work with an SVP of 2, 250,000 jobs available nationally). According to Plaintiff, the tasks required to perform the assembler and information clerk jobs do not comport with the limitations in ALJ's RFC assessment. However, there is no evidence to suggest, and Plaintiff does not argue, that the tasks required to perform the third job, bench work, would be inconsistent with the limitations set in the ALJ's RFC determination. There are 39,000 jobs available nationally, a significant number for purposes of a step five analysis. *See Adrienne M. v. Comm'r, Soc. Sec. Admin.*, No. CV DLB-18-3627, 2020 WL 1430508, at *8 (D. Md. Mar. 23, 2020) (finding that

*James L. v. Commissioner, Social Security*
Civil No. MJM-21-1718
September 30, 2022
Page 18

20,000 jobs available nationwide represents a significant number of jobs at step five), *aff'd sub nom. Mallard v. Berryhill*, 858 F. App'x 70 (4th Cir. 2021).

The second hypothetical was based on the first hypothetical but with the added limitation of absence three to four days per month or off task 20% or more of the time. (R. 58). The vocational expert testified that there are no jobs available for this hypothetical person nationally. (*Id.*) This added limitation was largely based on Dr. Carter's assessment of Plaintiff's mental capacity, which the ALJ considered in her analysis but determined to be minimally persuasive. It may also stem from Dr. Carter's 2017 estimate of possible flare-ups for the next six months, but, as discussed above, no evidence supports any future flare-ups, as the last one reportedly took place in 2018. (R. 26, 474). For this reason, this added limitation was not included in the ALJ's RFC. Because the ALJ "is afforded great latitude in posing hypothetical questions," *France*, 87 F.Supp.2d at 490, and her first hypothetical question included all of the limitations substantiated by the record evidence, the ALJ was under no obligation to adopt the vocational expert's findings regarding a more restrictive hypothetical that was not fully supported by the record. Accordingly, the SSA has satisfied its burden at step five of the evaluation process.

### V.     **Conclusion**

Because there is substantial evidence to support the ALJ's findings and the findings were reached through application of the correct legal standards, Plaintiff's Motion for Summary Judgment (ECF No. 14) will be DENIED, and Defendant's Motion for Summary Judgment (ECF No. 18) will be GRANTED. The SSA's decision will be AFFIRMED pursuant to sentence four of 42 U.S.C. § 405(g).

A separate Order will follow.

Sincerely,

/S/

Matthew J. Maddox
United States Magistrate Judge